IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs at Knoxville November 17, 2015

**MICHAEL DAVIS v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 12-00037      James M. Lammey, Jr., Judge**

**No. W2015-00227-CCA-R3-ECN  -  Filed January 14, 2016**

The Petitioner, Michael Davis, appeals the Shelby County Criminal Court's denial of his petition for a writ of error coram nobis regarding his 2013 conviction for second degree murder and his resulting sentence of life imprisonment without the possibility of parole. The coram nobis court denied relief on the grounds that the purported evidence was not newly discovered and that it was cumulative to evidence presented at the trial. On appeal, the Petitioner contends that the court erred by denying relief. We affirm the judgment of the coram nobis court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Terrell L. Tooten, Memphis, Tennessee, for the appellant, Michael Davis.

Herbert H. Slatery III, Attorney General and Reporter; Ahmed A. Safeeullah, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Chris West and Bryce Phillips, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

This case relates to the 2011 killing of Lataska Applewhite. This court summarized the facts of the case in the appeal of the Petitioner's conviction:

At trial, Marvis Applewhite testified that she was the victim's mother and that she last saw her daughter alive on Monday, November 28, 2011, before she left to go to work. Ms. Applewhite testified that, at the time of the victim's death, the victim was residing at 329 Stoneham with the defendant.

Ms. Applewhite also identified a series of photographs of the defendant's customized, reddish-orange Chevrolet Suburban, explaining that she was familiar with the defendant's vehicle because the defendant always drove it and parked it directly in front of the Stoneham residence. On cross-examination, Ms. Applewhite agreed that the victim was also known as "Tasha."

A stipulation of fact between the State and the defendant that was read to the jury provided:

> Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:
>
> 1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182,
>
> 2. That Michael Davis called 911 four times on the morning of 11-29-11,
>
> 3. That the attached disc is a true and accurate copy of all the calls and conversations recorded by 911 concerning 329 Stoneham, Memphis, TN on the morning of 11-29-11.
>
> Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

Joshua Wood with the Memphis Fire Department ("MFD") testified that he was employed as both a firefighter and a paramedic with the MFD. In the early morning hours of November 29, 2011, he was "on the ambulance as a paramedic" when he was dispatched to 329 Stoneham to attend to "a fall victim." Mr. Wood testified that the 911 dispatcher was confused because two addresses had been provided for the fall victim. Mr. Wood and his partner proceeded to the Stoneham residence address. Upon their arrival, Mr. Wood noticed that the house was completely dark, which he testified was unusual, stating that "if you make a 911 call . . . they're going to flip on the porch light." Mr. Wood arrived just before 2:00 a.m., and he and his partner discovered the front door of the residence was unlocked, but a pit bull was barking aggressively just inside the front door. Because they are trained not to

enter a residence until an aggressive dog has been secured, Mr. Wood's partner began to call out to anyone inside the residence, and he received no response. Mr. Wood and his partner then circled the house, hoping to hear someone calling out for them. As they returned to the front of the house, a man driving a Chevrolet Suburban arrived at the house and yelled through his car window that "'[s]he's in the bedroom. She's bleeding from the head. Get inside and help her.'" Mr. Wood responded that he and his partner could not get past the dog. The man in the vehicle stated that "'[s]he's bleeding to death" and that "'she's hit her head.'" The man rushed into the house, grabbed the dog by the collar, and backed away from the front door. Mr. Wood described the man as a light-skinned, African-American man of average height with short hair, and he estimated his age to be mid-30s to mid-40s.

The man directed Mr. Wood and his partner to a back bedroom in the residence. When they entered the bedroom, they discovered the victim positioned in the floor on her side "with a blood-soaked towel covering her head and . . . there's blood all over the bed." Mr. Wood immediately realized that the victim's injuries were not the result of a fall. Because of the amount of blood loss, the lack of a pulse, and the fact that the victim was cool to the touch, Mr. Wood surmised that the victim was deceased. Mr. Wood asked his partner to give him the cardiac monitor so that they could check for any sign of life, but Mr. Wood commented that he believed the victim was already dead. At that time, Mr. Wood heard the front door slam, followed by the sound of the Suburban leaving the scene.

After verifying that the victim was deceased and noticing a bullet entrance wound on the victim's body, Mr. Wood's partner notified police dispatch to respond to the scene of a murder.

Officer Antoine Wellington with the Memphis Police Department ("MPD") testified that he was dispatched to 329 Stoneham in the early morning hours of November 29. Upon his arrival, he learned that the victim was deceased, and he secured the scene.

La'Monica Applewhite, the victim's younger sister, testified that she last saw the victim around 7:00 p.m. on November 28. Ms. Applewhite stated that the victim was "fine" and that the two of them were discussing plans for the victim's birthday, which was on Christmas Day. Ms. Applewhite stated that the victim was cooking dinner while they talked, and Ms. Applewhite departed after 15 to 20 minutes.

Sometime between 1:30 a.m. and 2:00 a.m. on November 29, Ms. Applewhite, who lived four houses away from the victim, was awakened by a call on her cellular telephone from the defendant. Ms. Applewhite testified that the defendant informed her that "there had been a scuffle" with the victim, that "the gun accidentally went off," and that Ms. Applewhite should go to the victim's house and "check on her." Ms. Applewhite proceeded to her front door and saw "ambulance lights" in front of the victim's house. Ms. Applewhite ran to the victim's house, but law enforcement officers would not allow her to go inside. Officers escorted Ms. Applewhite to a police cruiser and instructed her to wait in the back of the vehicle. While she was sitting there, she overheard another officer mention a "homicide," at which point she knew the victim was deceased. Ms. Applewhite testified that the defendant called her cellular telephone several times while she was sitting in the squad car, but she was unable to take the calls because the officers had confiscated her telephone.

On cross-examination, Ms. Applewhite acknowledged that she did not answer the first call the defendant made to her on the morning of November 29. She also admitted that the victim had arranged for the defendant to pay the victim's mortgage if the victim had to report to jail in January on a juvenile matter.

MPD Sergeant Vivian Murray with the homicide bureau testified that, as part of her investigation, she learned that the defendant was a possible suspect in the victim's murder and that he had been located in Bexar County, Texas.

MPD crime scene investigator Eric Carlisle testified that he was responsible for taking measurements and collecting evidence at the scene as well as drawing a sketch of the crime scene. Officer Carlisle testified that he recovered a .22 caliber revolver from a drawer in the nightstand of the victim's bedroom.

On cross-examination, Officer Carlisle testified that the condition of the victim's bedroom made it appear as if a struggle had occurred. Officer Carlisle admitted that there appeared to be a bullet hole in the wood floor near the foot of the victim's bed, and he saw an apparent bullet hole in the door leading to a second bedroom.

MPD crime scene investigator Charles Cathey testified that his responsibilities on November 29 included photographing the crime scene and writing a report. Through the testimony of Officer Cathey, the State introduced several photographs depicting the victim and the crime scene, which included photographs of a bloody footprint on some papers scattered on the bedroom floor, blood droplets on the floor of both the bedroom and the kitchen, blood on the victim's bed, and the revolver in the nightstand drawer.

On cross-examination, Officer Cathey admitted that the numerous items strewn about the bedroom were indicative of a struggle. Officer Cathey also admitted that he extracted a bullet fragment from a hole in the floor, but he was unable to determine the bullet's caliber.

MPD Lieutenant Anthony Mullins testified as an expert in bloodstain pattern analysis. Lieutenant Mullins stated that, in November 2011, he was a sergeant assigned to the homicide bureau and that he was the first homicide sergeant on the crime scene. Lieutenant Mullins testified that he observed the victim lying alongside the bed, and he noticed "a lot of blood on the bed" with "some impact spatter and transfers on the bed" along with " a lot of dripped blood on the floor" and "transfer patterns out in the floor . . . like shoe prints." Lieutenant Mullins testified that a small amount of blood evidence was found in the hallway and in the kitchen but that the vast majority of the blood evidence was contained in the victim's bedroom.

Based on the position of the victim's body and Lieutenant Mullins's analysis of the bloodstain pattern, he offered the following opinion:

> My opinion is, like I've said, when she is shot, she is at the bed. Now, again, I'm not going to try and tell you that she's standing her full height or bent over the bed or kneeling on the bed or lying on the bed; but based on the lack of blood on her clothes from the pooling that you saw on the bed, at least her head is on the bed; and she laid there for enough time for that blood to pool. It could be just a matter of a few minutes; and the[n] somebody – not her – moved her from that position down onto the floor; and when they did that, that's when you started seeing that dripped blood on the floor by the bed and then the drips going toward her head and then the projected pattern by her bed from trying to hold her up; and I'm assuming, based on this, that it's not just quickly throwing her on the floor; that

they're trying to lay her on the floor. So, she drips enough blood to spatter somehow. So, somebody has removed her from her original position down onto the floor.

And to me, the significance is, is the way the call came in to the paramedics was she fell [and] hurt her head. But she did not fall on her own.

On cross-examination, Lieutenant Mullins agreed that the blood patterns were consistent with the victim's being shot near the edge of the bed and with her face lying on the bed for a couple of minutes. Lieutenant Mullins testified that it appeared that the victim had "been moved from the bed and held more or less upright – enough that she is dripping blood" on the floor by the bed. Lieutenant Mullins agreed that "there was some time used to get her down" onto the floor.

Doctor Miguel Laboy, Assistant Medical Examiner for Shelby County, performed the autopsy of the victim. Doctor Laboy testified that he did not observe any evidence of trauma to the victim's upper extremities including her left hand. Doctor Laboy observed a gunshot wound "of close range" to the left side of the victim's face. Based on the gun powder stippling on the victim's face, Doctor Laboy determined that the bullet had been fired from close range, and the rounded shape of the entry wound indicated to Doctor Laboy that the gun was fired at a 90 degree angle from the victim's face. Doctor Laboy testified that the bullet traveled upward and lodged in the victim's brain. Toxicology testing revealed the presence of marijuana and cocaine in the victim's blood. Doctor Laboy opined that the victim's cause of death was the gunshot wound to the head and that the manner of death was homicide.

On cross-examination, Doctor Laboy confirmed that the bullet recovered from the victim's head was a medium-caliber bullet that was not consistent with a .22, which Doctor Laboy classified as a smaller caliber bullet.

. . . .

April Fleming testified that she had been the victim's best friend and that she had accompanied the victim to juvenile court on November 28, 2011, where the judge had threatened to "lock [the victim] up that day." Ms. Fleming testified that the juvenile court judge had agreed to allow the victim to remain out of jail through the holidays but that the victim was required to

return to court in January "to turn herself in." Later that afternoon, Ms. Fleming visited the victim at the victim's home, and Ms. Fleming testified that, although the victim was sad that she would have to go to jail in January, she was also "happy" and "smiling" because she would be able to celebrate her birthday and the new year at home. While Ms. Fleming was present, the defendant called the victim to inquire whether he could bring anything to her house, and the victim asked the defendant to bring cake and ice cream.

Bobby Howard testified that he had known the defendant for approximately 15 years and the victim for approximately 10 years and that he had met them through "the neighborhood." Mr. Howard stated that he saw the victim sometime after midnight on November 29 driving the defendant's Chevrolet Suburban. The victim gave Mr. Howard a ride to her house, where he stayed "probably two minutes," and he never saw the defendant during that time.

Two stipulations of fact between the State and the defendant were read to the jury. The first provided as follows:

> Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:
>
> 1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182,
>
> 2. That the attached records are true and accurate copies of all phone calls made and received from (901) 643-9182 between 11-28-2011 and 11-29-2011.
>
> Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

The second stipulation provided:

> Comes now the State of Tennessee and the Defendant Michael Davis and would stipulate and agree as fact the following:
> 1. That Michael Davis was in possession of a cellular phone with the number (901) 643-9182 and made or received the following phone calls on 11-29-2011,

-7-

2. 1:27 called his mother . . . for 27 seconds,

3. 1:36 called 911 . . . for 1 minute 20 seconds, . . .

4. 1:39 called 911 . . . for 1 minute 58 seconds, . . .

5. 1:42 called Lamonica Applewhite . . . for 29 seconds,

6. 1:43 called Lamonica Applewhite . . . for 3 seconds,

7. 1:44 called 911 . . . for 1 minute 27 seconds, . . .

8. 1:46 received a call from his mother . . . for 38 seconds,

9. 1:55 called 911 . . . for 1 minute 52 seconds, . . .

10. 8:03 called The City Court Clerk's Office . . . for 11 seconds,

11. 8:03 called The Public Defender's Office . . . for 8 seconds,

12. 8:10 called The Public Defender's Office . . . for 4 seconds,

13. 8:10 called The District Attorney General's Office . . . for 1 minute 47 seconds,

14. 8:19 called the Criminal Court Clerk's Office . . . for 33 seconds,

15. 8:19 called the District Attorney General's Office . . . for 1 minute 17 seconds,

16. 8:35 called the District Attorney General's Office . . . for 10 minutes 32 seconds,

17. 8:46 called the District Attorney General's Office . . . for 8 seconds,

18. 8:46 called Missy Branham, Assistant District Attorney General, . . . for 1 minute 31 seconds,

19. 8:48 called Missy Branham, Assistant District Attorney General, . . . for 8 seconds,

20. 8:48 called the District Attorney General's Office . . . for 51 seconds,

21. 8:50 called Missy Branham, Assistant District Attorney General, . . . for 2 minutes 18 seconds,

22. 8:53 called Coleman Garrett, Attorney, . . . for 1 minute 31 seconds,

23. 8:54 called Coleman Garrett, Attorney, . . . for 5 minutes 7 seconds.

Signed Christopher L. West, Assistant District Attorney; Nicholas Cloud, Attorney for the Defendant; and Michael Davis.

The defendant testified that he met the victim in 1996 and that the two of them began dating in May 2011. The defendant moved into the victim's house in late July or early August 2011. The defendant testified that, when he arrived at the victim's house on November 28, 2011, the victim "was very upset" due to the events that had transpired earlier in the day at juvenile court. The defendant attempted to console her by, among other things, bringing cake and ice cream to the victim. Because the victim was anticipating going to jail in January, she asked the defendant to remain at her house and pay her mortgage for her. Later that evening, the defendant and the victim got into bed to watch a movie, and the defendant fell asleep. The victim roused the defendant around 10:00 p.m. or 11:00 p.m. and asked him for money so that she could purchase a handbag from a friend. The defendant obliged, and the victim left the house to make her purchase. When she returned, she showed the defendant her new handbag, and the victim and the defendant resumed watching the movie. Once again, the defendant fell asleep.

The defendant awoke sometime later when the victim struck him in the abdomen. The defendant testified that the victim was standing over him, yelling and accusing him of infidelity. The victim then threw the defendant's

cellular telephone, striking the defendant in the face. The defendant took the telephone and immediately called his mother, explaining that he and the victim had experienced "situations before." The defendant testified that the victim "became irate" and threatened to kill him if he left her. The defendant began packing his things while the victim threw items at him. The fracas continued as the defendant gathered his belongings, and, at some point, the defendant turned to discover that the victim was pointing her .38 revolver at him. The defendant pushed the victim into a wall in an attempt to disarm her, and he "noticed that the weapon was cocked." The defendant described the struggle as follows:

> During the struggle over the weapon, as I – as I – as I grabbed her arm, once I was got up against the wall, I was able to kind of – got her body up against my shoulder, and I could hold her arm, and now I can get a grip – take the weapon away from her – take the top. So, as we struggled over the weapon, and I pulled away, the weapon discharged.

The defendant denied ever touching or pulling the trigger. When the defendant realized that the victim had been shot, he called her name and received no response. He laid the victim on the bed and attempted to apply pressure to the wound, but when the bleeding continued, he moved the victim to a seated position in a corner of the room. He then decided to place the victim on the floor so that "her body weight would apply pressure" to the wound while he called 911. In his first 911 call, the defendant gave a false name and an incorrect address and stated that the victim had fallen. He explained that he was "afraid that the situation would be judged because I have a past." The defendant then placed the gun inside his truck before calling 911 again and providing the correct address.

The defendant testified that he then called Ms. Applewhite and drove away from the house as he tried to determine how to get help for the victim. He returned to the house and discovered that the paramedics had arrived. He screamed at the paramedics, urging them to go inside to help the victim. When the paramedics explained that they could not enter the house because of the dog, the defendant ran into the house and secured the dog. While the paramedics were tending to the victim, he left the house because he was "afraid" and "scared" that he "wouldn't be heard if [he] explained to the police" what had transpired.

-10-

The defendant testified that he made several telephone calls later that morning, eventually speaking to a prosecutor who informed him that he needed to contact an attorney. When the defendant contacted attorney Coleman Garrett, Mr. Garrett advised the defendant to turn himself in. Instead, the defendant fled to San Antonio, Texas.

The defendant acknowledged that he had prior felony convictions consisting of two aggravated robberies, two aggravated assaults, and one aggravated kidnapping.

The defendant testified that the victim had fired her .38 at him on a prior occasion, leaving bullet holes in both her bedroom floor and the door of a second bedroom, and that she fired the gun at him on another occasion when he was attempting to leave the house following an altercation. The defendant also testified that the victim had told him that she "had shot a previous boyfriend . . . that had got another woman pregnant while they was together."

On cross-examination, the defendant admitted that he struck the victim in the face during an altercation that had occurred in late October or early November 2011. The defendant also admitted that he did not contact the police after any of these prior altercations with the victim. When asked in which hand the victim was holding the gun on November 29, the defendant confirmed that it was her left hand.

Marion Drake, the defendant's mother, testified that she had spent time with the victim on approximately three occasions. Ms. Drake stated that, when the defendant was with her, the victim would call him repeatedly, which was upsetting to the defendant. With respect to the morning of November 29, Ms. Drake testified that the defendant called her to notify her that he was coming to her house, but he never arrived.

Marty Marmon, the defendant's cousin, testified that he once picked up the defendant following the defendant's release from jail and that he drove the defendant to the victim's house. When they arrived, the victim walked out of her house holding a revolver, claiming that the defendant had cheated on her. The defendant asked for his belongings, and the victim replied that she had put them in his truck. When the defendant attempted to start the vehicle, the victim informed him that she had unhooked the battery. The defendant was examining the battery when the victim "fired at the tire first," then fired two more shots "going toward [the defendant] by the hood." Mr. Marmon

confirmed that the defendant was not hit by any of the shots. The defendant ran to Mr. Marmon's car, and the two of them drove away.

Gina Taylor testified that she had never met the defendant but that, in 2006, the victim had stabbed her during a violent altercation. Ms. Taylor stated that the victim was later convicted of aggravated assault.

Floyd Payne testified that he had been a friend of the victim's for 10 to 15 years. He testified that the victim would often be angry with the defendant and that, on one occasion, he heard the victim fire a gun while arguing with the defendant. Mr. Payne stated that, on another occasion, he saw the victim pointing a gun at the defendant.

At the conclusion of the defendant's proof, the State recalled the victim's mother, Marvis Applewhite, who testified that the victim was right-handed.

*State v. Michael Davis*, No. W2013-01122-CCA-R3-CD, 2014 WL 1258844, at \*1-7 (Tenn. Crim. App. Mar. 26, 2014), *perm. app. denied* (Tenn. Aug. 26, 2014).

On January 9, 2014, the Petitioner filed the present petition for a writ of error coram nobis relying on alleged newly discovered evidence in the form of witness accounts from the victim's son and Audry Lovett relative to the victim's abusing crack cocaine and becoming the aggressor and initiator of violent incidents, which sometimes involved firearms. The Petitioner stated he learned the substance of the witnesses' accounts on April 16, 2013, and August 9, 2013, respectively, after the jury returned a guilty verdict in February 2013. The Petitioner also alleged that Christoper Laird had personal experience with drug use, effects, and treatment and that his testimony was, likewise, newly discovered evidence. The Petitioner argued that this newly discovered evidence supported and bolstered his claim that a cycle of domestic abuse existed and that the victim was the first aggressor of the incident resulting in her death.

At the evidentiary hearing, Shaquille Sugars, the victim's son, testified that the Petitioner and the victim were dating at the time of the shooting. Mr. Sugars said that he loved his mother but that she had a drug problem. He said the victim became abusive and aggressive while under the influence of drugs. He recalled the victim's pointing guns at him, his brother, and the victim's various boyfriends. He said that he did not live with his mother for an extended period of time because she was in prison, that he reconnected with his mother after her release, and that he lived with her during the two years leading up to her death. He recalled one incident during which he came home late. He said his mother

-12-

attempted to "fight" him and brandished a gun, which he knew was loaded. He said that the police were called to the home once but that he usually left the home when his mother became aggressive and walked to his grandmother's home down the street.

Mr. Sugars testified that he last spoke to the Petitioner in October 2012, and that he told the Petitioner about his mother's violent tendencies. Mr. Sugars recalled an incident during which the victim placed her hands in the Petitioner's face, accused the Petitioner of having a romantic relationship with another woman, and threatened to shoot the Petitioner if she caught him with another woman.

On cross-examination, Mr. Sugars testified that the incident during which the victim threatened to shoot the Petitioner occurred in September before the victim's death in November. He said that he, his brother, the Petitioner, and the victim were driving to McDonald's when the victim threatened the Petitioner. Mr. Sugars said he moved out of his mother's home in November before the shooting because the victim was always aggressive and pointed guns at him and his brother. Mr. Sugars denied the Petitioner knew or asked about the victim's pointing guns at Mr. Sugars and his brother.

Upon examination by the trial court, Mr. Sugars testified that at the time of the hearing, he was confined to the county jail for a pending robbery charge. The court reviewed Mr. Sugars's court record and noted Mr. Sugars pleaded guilty to misdemeanor theft earlier that month and had received judicial diversion for aggravated burglary the previous year.

On redirect examination, Mr. Sugars testified that the Petitioner knew Mr. Sugars moved into Mr. Sugars's grandmother's home after leaving the victim's home. He said that although the Petitioner knew he had moved into his grandmother's home, the Petitioner did not know the address or telephone number.

Upon examination by the trial court, Mr. Sugars testified that his younger brother called the police two or three times when the victim became aggressive and assaultive and that they lived at the address where the victim was killed when the police were called. He said the incidents occurred within a five-month period.

Audry Lovett testified that he and the Petitioner attended the same school and that he last saw the Petitioner while they were both serving time in a state correctional facility. He said he last spoke to the Petitioner in May 2013. Mr. Lovett said he attended school with the victim and had known her for several years at the time of her death. He said that in 2004 or 2005, he sold drugs and that the victim began buying crack cocaine from him around that time. He said that although the victim was a friend, drugs changed her personality. He

recalled the victim's behaving out of control and threatening to harm him. He said the victim used crack cocaine daily.

On cross-examination, Mr. Lovett testified that he last saw the victim in October 2011 standing across the street from his house but that they did not speak. He said he last spoke to the victim in late 2005. He said the victim became angry and violent when he told the victim he did not have any drugs to sell. He said the victim struck items in his yard with a broomstick because she thought he was lying. He said that before the 2005 incident, the victim only had "attitude problems." He said that he did not see the Petitioner between 2011 and 2013. He agreed that he had previous convictions for possession with the intent to sell cocaine and introduction of contraband into a penal facility and that he was currently serving time in confinement regarding a cocaine-related charge.

The Petitioner testified that Mr. Sugars lived with him and the victim until early October 2011 and that Mr. Sugars and the victim had a "trying relationship." The Petitioner thought the problems between Mr. Sugars and the victim stemmed from Mr. Sugars's adolescence and the victim's not approving of Mr. Sugars's life choices. The Petitioner said he did not speak to Mr. Sugars from 2011 until April 2013. He said that he and Mr. Sugars spoke while they were confined in the same correctional facility and that the Petitioner learned why Mr. Sugars moved out of the victim's home. He said that Mr. Sugars provided details about violent incidents occurring between Mr. Sugars and the victim before the Petitioner moved into the victim's home. The Petitioner denied knowing about the victim's violent tendencies toward Mr. Sugars and Mr. Sugars's younger brother. The Petitioner said that Mr. Sugars told him in 2013 about the victim's pointing a gun at Mr. Sugars.

The Petitioner testified that to his knowledge, trial counsel did not know about the victim's violent outbursts. He said that he asked counsel if he knew of the victim's violent tendencies and that counsel denied having any knowledge of it. The Petitioner said that he provided Mr. Sugars with the Petitioner's mother's address and that his mother received Mr. Sugars's handwritten affidavit regarding the violence.

The Petitioner testified that before his incarceration, he last saw Mr. Lovett in 2003 or 2004 and that he saw Mr. Lovett in 2013 when they were confined in the same correctional facility. The Petitioner said Mr. Lovett disclosed the victim's violence toward Mr. Lovett. The Petitioner said that he was unaware of the victim's violence toward Mr. Lovett before his trial and that to his knowledge, trial counsel was also unaware.

On cross-examination, the Petitioner testified that Mr. Sugars was age sixteen or seventeen when Mr. Sugars lived with him and the victim. The Petitioner denied that he acted as Mr. Sugars's stepfather and said that he was not involved in family matters and that

he and Mr. Sugars did not have a personal relationship. The Petitioner said that he met Mr. Sugars in July or August 2011 and that the Petitioner moved in with the victim around the same time. Relative to Mr. Lovett, the Petitioner said he did not know of any incident in which the victim was violent with Mr. Lovett.

The coram nobis court denied relief. The court found that the testimony of Mr. Sugars and Mr. Lovett did not constitute newly discovered evidence. The court found that although Mr. Sugars's testimony was relevant to the issues presented at the trial, the information was discoverable before the trial. The court found that the Petitioner knew Mr. Sugars was a potential trial witness because Mr. Sugars and the Petitioner lived at the victim's home for at least three months and because the Petitioner knew Mr. Sugars witnessed the victim's aggression and violence toward the Petitioner. The court found that even if the evidence had been newly discovered, the Petitioner failed to show that he was without fault for failing to present Mr. Sugars at the trial. The court found that although the Petitioner did not have Mr. Sugars's telephone number after Mr. Sugars moved out of the victim's home, the Petitioner knew Mr. Sugars moved into his grandmother's home, which was located down the street from the victim's home.

The coram nobis court found that Mr. Lovett's testimony, and Mr. Sugars's testimony to some extent, was cumulative to the evidence presented at the trial. The court found that at the trial, the defense presented four witnesses who testified about the victim's violent behavior, including the victim's firing a gun at one witness and stabbing another witness. The court found that the trial evidence showed the victim was convicted of aggravated assault relative to the stabbing. The court found it was unlikely the jury would have reached a different verdict based upon the testimony of Mr. Lovett and Mr. Sugars. This appeal followed.

The Petitioner contends that the coram nobis court erred by denying his petition because the evidence was newly discovered and was not cumulative of the evidence presented at the trial. The State responds that the court properly denied relief. We agree with the State.

A writ of error coram nobis lies "for subsequently or newly discovered evidence relating to matters which were not litigated at the trial if the judge determines that such evidence may have resulted in a different judgment, had it been presented at the trial." T.C.A. § 40-26-105(b) (2012); *State v. Hart*, 911 S.W.2d 371, 374 (Tenn. Crim. App. 1995); *see Cole v. State*, 589 S.W.2d 941 (Tenn. Crim. App. 1979). The purpose of a coram nobis proceeding "is to bring to the attention of the court some fact unknown to the court, which if known would have resulted in a different judgment." *State ex rel. Carlson v. State*, 407 S.W.2d 165, 167 (Tenn. 1966). The decision to grant or deny such a writ rests within the

sound discretion of the court. *Jones v. State*, 519 S.W.2d 398, 400 (Tenn. Crim. App. 1974); *see Teague v. State*, 772 S.W.2d 915, 921 (Tenn. Crim. App. 1988). A petition for a writ of coram nobis must be filed within one year of the judgment becoming final in the trial court. *State v. Mixon*, 983 S.W.2d 661, 670 (Tenn. 1999). A judgment becomes final "thirty days after its entry in the trial court if no post-trial motions are filed or upon entry of an order disposing of a timely filed, post-trial motion." *Harris v. State*, 301 S.W.3d 141, 144 (Tenn. 2010).

"When a petitioner seeks a writ of error coram nobis based on newly discovered evidence of actual innocence, due process considerations may require tolling of the statute of limitations." *Harris*, 301 S.W.3d at 145 (citing *Workman v. State*, 41 S.W.3d 100, 101 (Tenn. 2001)). "[B]efore a state may terminate a claim for failure to comply with procedural requirements such as statutes of limitations, due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner." *Burford v. State*, 845 S.W.2d 204, 208 (Tenn. 1992); *see Workman*, 41 S.W.3d at 102. However, a petitioner "must exercise due diligence in presenting the claim." *Harris*, 301 S.W.3d at 144. Whether due process principles require tolling the statute of limitations is a mixed question of law and fact and is reviewed de novo with no presumption of correctness. *See Vaughn v. State*, 202 S.W.3d 106, 115 (Tenn. 2006).

The record reflects that at the trial, the Petitioner testified that the victim woke him by striking him in the abdomen, accusing him of infidelity, and throwing his cell phone at him. The Petitioner stated that the victim was angry and threatened to kill herself if he left and that the victim pointed a handgun at him. The Petitioner stated that a struggle ensued, resulting in the victim's death. The Petitioner also testified that the victim shot at him on two previous occasions and that she claimed to have shot a previous boyfriend for infidelity. The record confirms the coram nobis court's finding that the Petitioner presented additional witnesses who testified about the victim's violent actions. Marty Marmon testified about the victim's shooting at the Petitioner after Mr. Marmon drove the Petitioner to the victim's home. Gina Taylor testified about the victim's stabbing her and about the victim's respective aggravated assault conviction. Last, Floyd Payne testified that the victim was often angry at the Petitioner and that Mr. Payne heard the victim fire a gun while arguing with the Petitioner. Mr. Payne also saw the victim point a gun at the Petitioner on another occasion.

We conclude that the coram nobis court did not abuse its discretion by denying relief. The record reflects that the Petitioner knew of the victim's violent tendencies before the trial and that he presented at the trial ample evidence of her violence toward the Petitioner and other individuals. Although the testimony of Mr. Sugars and Mr. Lovett supported the Petitioner's defense that victim was violent and had brandished weapons during confrontations, we cannot conclude that the jury would have reached a different verdict had

the witnesses been presented at the trial. We note that the Petitioner and Mr. Sugars lived with the victim during the time in which the victim was violent toward Mr. Sugars and his younger brother. Although no evidence shows that the Petitioner witnessed the victim's brandishing a handgun during her various confrontations with Mr. Sugars, the Petitioner knew Mr. Sugars and the victim had a "trying relationship." Mr. Sugars testified that his younger brother called the police two or three times because of the victim's aggressive and assaultive behavior and that he told the Petitioner about his mother's violent tendencies in October 2012. We note that Mr. Sugars and his younger brother were present during an incident in which the victim accused the Petitioner of infidelity and threatened to kill the Petitioner. Likewise, the Petitioner knew Mr. Sugars and his younger brother moved out of the victim's home and into their grandmother's home. Mr. Lovett provided additional evidence of the victim's violent and threatening behavior. Although the Petitioner was unaware of the victim's violence toward Mr. Lovett, the Petitioner presented multiple trial witnesses who provided the jury with information relative to the victim's violent tendencies. We cannot conclude that the jury would have reached a different verdict had Mr. Sugars and Mr. Lovett testified at the trial. The Petitioner is not entitled to relief.

In consideration of the foregoing and the record as a whole, the judgment of the coram nobis court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE

-17-